Electronically Filed
Supreme Court
SCWC-15-0000663
20-NOV-2018
10:04 AM

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

---

DANE S. FIELD, TRUSTEE OF THE BANKRUPTCY ESTATE OF ALOHA SPORTS
INC., Petitioner/Plaintiff-Appellant,

vs.

THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, AN UNINCORPORATED
ASSOCIATION, Respondent/Defendant-Appellee.

---

SCWC-15-0000663

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-15-0000663; CIV NO. 06-1-1832)

NOVEMBER 20, 2018

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY POLLACK, J.

This case arises out of the uncompleted sale of one
business to another. The plaintiff alleges that the defendant
engaged in an unfair method of competition to terminate the
transaction in violation of Hawai'i antitrust law. At issue in
this case is what a plaintiff must demonstrate to withstand
summary judgment on a claim for an unfair method of competition

under Hawaii Revised Statutes (HRS) Chapter 480. In particular, we address the plaintiff's requirement of showing that the defendant's conduct would negatively affect competition or harm fair competition. Consistent with our case law, we conclude that to raise an issue of material fact as to the nature of competition requirement of an unfair method of competition claim following the close of discovery, a plaintiff must demonstrate that the defendant's alleged anticompetitive conduct could negatively affect competition but need not prove that the defendant in fact harmed competition. Further, we reaffirm that in order to withstand summary judgment, a plaintiff may generally describe the relevant market without resort to expert testimony and the plaintiff need not be a competitor of or in competition with the defendant.

## I.    BACKGROUND AND PROCEDURAL HISTORY

### A.    Factual Background

The National Collegiate Athletic Association (NCAA) is a non-profit, unincorporated voluntary association of approximately 1,200 colleges and universities, athletic conferences, and sports organizations. The NCAA regulates and controls Division I-A postseason college football bowl games in which qualifying NCAA Division I-A members may participate. Independent businesses (bowl sponsoring agencies) organize and

promote the bowls subject to annual recertification[1] by the NCAA Football Certification Subcommittee (the Subcommittee). The Subcommittee is composed of representatives from NCAA member schools, as well as NCAA staff that serve as non-voting liaisons.

Aloha Sports, Inc.[2] (Aloha Sports) is a former bowl sponsoring agency that produced Division I-A NCAA postseason college football bowl games. Aloha Sports organized, produced, and promoted the NCAA-certified Aloha Bowl in Honolulu from 1982 to 2000. In 1998, Aloha Sports established and received NCAA certification of the Oahu Bowl and began to promote the two bowl games together. For various reasons unrelated to this appeal, Aloha Sports relocated both bowls to the continental United States following the 2000 season. In the 2001 season, Aloha Sports sought and received NCAA recertification of the Aloha Bowl as the San Francisco Bowl and of the Oahu Bowl as the

---

[1] The requirements for certification listed in the 2002-03 NCAA Bowl Handbook include, inter alia, exceeding a minimum amount of ticket sales, the implementation of a gross receipt sharing policy under which the institutions participating in the bowl each receive a minimum payout of $750,000, the performance of financial audits, the submission of a letter of credit, and compliance with certification application dates, fees, and procedures.

[2] On December 27, 2017, the ICA issued an order granting Aloha Sports, Inc.'s motion to substitute Dane S. Field, Trustee of the Bankruptcy Estate of Aloha Sports, Inc., for Aloha Sports, Inc. as plaintiff-appellant.

Seattle Bowl.  The Seattle Bowl was also recertified by the NCAA and presented by Aloha Sports during the 2002 season.

Several concerns arose with the management of the 2002 Seattle Bowl, including failures to timely submit a letter of credit to the NCAA and to make outstanding payments to participating teams and vendors.  Subsequently, Aloha Sports decided to sell its business.  In February 2003, Aloha Sports signed a letter of intent to transfer ownership and control of its business to Pro Sports & Entertainment, Inc. (Pro Sports) for the sum of $2,031,000.  The sale was contingent upon NCAA recertification of the Seattle Bowl for the 2003 season.  On April 1, 2003, Aloha Sports submitted an application for recertification of the Seattle Bowl for the 2003 season to the NCAA.

In April 2003, the Subcommittee met over four days to make certification decisions for the 2003 season.  At an unknown date, an NCAA internal memorandum titled "Seattle Bowl Issues" was created that provided information regarding the pending Seattle Bowl recertification.  The memorandum stated that ongoing issues existed with the management of the Seattle Bowl, including a submission of an inaccurate audit report, a failure to pay the required certification fee, and a late letter of credit.  The memorandum also noted the intended sale of Aloha

Sports to Pro Sports, including that the sale was contingent upon recertification of the 2003 Seattle Bowl, and listed outstanding debts from the 2002 Seattle Bowl as "Feller Debts" in apparent reference to the president of Pro Sports, Paul Feller. Finally, under a section titled "Penalties" it stated "1) Withhold certification one year. 2) Impose financial penalty - fine up to 50% of gross receipts."

Paul Feller attended the Subcommittee certification meeting as a potential purchaser of Aloha Sports, along with James Haugh, president of Aloha Sports and executive director of the Seattle Bowl. Terry Daw, owner of Aloha Sports, also participated by phone during the portions of the meeting related to the Seattle Bowl. In a discussion regarding the Seattle Bowl's recertification, Pro Sports presented the Subcommittee with information regarding Pro Sports' plan for addressing outstanding issues from the 2002 Seattle Bowl, as well as the company's financial capacity and relevant experience with event management and promotion. During that meeting, Dennis Poppe, an NCAA staff liaison to the Subcommittee, expressed concerns about Daw's prior management of the Seattle Bowl and sought assurance that Daw would not be involved after a transfer of Aloha Sports to Pro Sports.

In a second meeting, Poppe and members of the Subcommittee informed Feller, Haugh, and Daw[3] that the Subcommittee had decided to decertify the Seattle Bowl. Haugh was then asked to leave the room, and Feller was privately informed by Poppe and the Subcommittee members that Pro Sports could independently submit an application to certify the Seattle Bowl for the 2004 season.

The Subcommittee's decision to decertify the Seattle Bowl was formally announced the following day.[4] Following the announcement, Aloha Sports requested that the NCAA instead place the Seattle Bowl on one-year probation as it had done with two other bowl games that had failed to submit timely letters of credit. The NCAA rejected Aloha Sports' request, and the Seattle Bowl was decertified as announced.

At the time, the NCAA's Postseason Handbook contained conflicting provisions concerning the consequences of a sponsoring agency's nonfulfillment of certification requirements. A new provision added in the 2002-03 Handbook stated, "If a sponsoring agency fails to meet the certification

---

[3] Daw again participated in the meeting by phone.

[4] An NCAA press release regarding the Subcommittee's decisions for the 2003 season bowls provided: "The committee did not recertify the Seattle Bowl, due to financial issues and failure to adhere to administrative requirements."

requirements, it <u>shall</u> be placed on probation for one year. If the sponsoring agency has not complied with the requirements by the end of the probationary period, the bowl shall lose its certification."[5] (Emphasis added.) The provision was also included nearly verbatim in two locations on the 2003 bowl recertification application form and in a November 18, 2002 memorandum sent to all executive directors of bowl games. The Handbook also retained a provision from previous years, however, which stated as follows:

> If the management of a certified game fails to comply with Bylaw 30.9, the requirement for an audited financial report for the immediate past game, or the NCAA's approved policies and procedures, the subcommittee has the option to withhold certification for the postseason bowl game for one year or fine it a percentage of its gross receipts, not to exceed 50 percent, from the contest involved in the noncompliance, with the amount to be determined by it and approved by the Division I Championships/Competition Cabinet.

As a result of the NCAA's decertification of the Seattle Bowl, the sale of Aloha Sports to Pro Sports was not completed and the 2003 Seattle Bowl was not held. On October 20, 2005, Aloha Sports filed a complaint and demand for jury trial against the NCAA in the Circuit Court of the First Circuit (circuit court).

---

[5] In the version of the Handbook released the following year, the provision was revised to state, "If a sponsoring agency fails to meet the certification requirements, it may either be put on probation for one year <u>or</u> be decertified for the next bowl season." (Emphasis added)

## B. 2005-2013 Court Proceedings

In its second amended complaint, Aloha Sports alleged four causes of action, including multiple unfair method of competition violations under HRS § 480-2 (1993 & Supp. 2002),[6] tortious interference with prospective economic advantage, and two breach of contract claims.[7] Aloha Sports contended that the NCAA violated HRS § 480-2's prohibition on unfair methods of competition by, inter alia, "refusing to permit a transfer of ownership of Plaintiff's NCAA Certified Postseason Football Bowl Games without good cause" (UMOC claim).[8]

---

[6]     HRS § 480-2 (2008) provides in relevant part as follows:

> (a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.
>
> . . .
>
> (e) Any person may bring an action based on unfair methods of competition declared unlawful by this section.

[7]     The Honorable Karen S.S. Ahn presided.

[8]     The other grounds alleged in the second amended complaint to be unfair methods of competition in violation of HRS § 480-2 were as follows: (1) requiring Aloha Sports to pay $75,000 or 75% of gross bowl revenues in equal proportion to participating teams; (2) arbitrarily penalizing sponsoring agencies for not meeting the payout requirements; (3) discriminatorily withdrawing certification of the San Francisco Bowl, refusing to recertify the Aloha Bowl, and decertifying the Seattle Bowl despite substantial compliance with the requirements for maintaining certification and receiving recertification; (4) imposing upon Aloha Sports unreasonable and arbitrary standards of conduct, and (5) terminating and refusing to renew Aloha Sports' San Francisco and Seattle Bowls without good cause and in violation of the NCAA's terms and standards applicable to all bowls.  These grounds are largely not relevant to this appeal, and all references to Aloha Sports' UMOC claim refer to only the alleged HRS § 480-2 violation in Subsection 23(f) of the second amended complaint based on the

(continued . . .)

The NCAA filed a motion to dismiss the second amended complaint with prejudice, contending, among other things, that Aloha Sports did not plead sufficient facts to support its UMOC claim. On February 26, 2008, the court entered an order granting in part and denying in part the NCAA's motion, dismissing with prejudice the UMOC claim for the reason cited by the NCAA and dismissing several of Aloha Sports' other claims for relief. (Order Dismissing UMOC Claim).

The remaining claims proceeded to jury trial in September 2011.[9] On September 8, 2011, at a hearing on a motion in limine prior to trial, Aloha Sports indicated that the intentional interference with prospective economic advantage claim was the sole grounds upon which it wished to proceed, as the company did not believe it was likely to prevail on its remaining claims (including the alleged violations of HRS § 480-2 that had not been previously dismissed).[10]

_____

(. . . continued)

NCAA's purported blocking of Aloha Sports' transfer of ownership to Pro Sports.

[9] The Honorable Karl K. Sakamoto presided over the jury trial, as well as a preceding motion granting Aloha Sports leave to file a third amended complaint excluding any claims related to the Aloha/San Francisco Bowl. The third amended complaint otherwise was identical to the second amended complaint.

[10] The transcript of the September 8, 2011 hearing reflects the following:

(continued . . .)

On September 19, 2011, the jury returned a verdict in favor of the NCAA on Aloha Sports' claim for tortious interference with prospective business advantage. On January 12, 2012, the court entered final judgment in favor of the NCAA as to all claims. The final judgment stated that the UMOC claim

---

(. . . continued)

> [ALOHA SPORTS]: Correct. Just for the record, your Honor, the sole claim on which we're proceeding we can abandon all other claims which may have been pled. The sole claim in which we're proceeding is intentional interference with prospective business advantage. That's it. So all the antitrust claims, the franchise claims, the claim under 480-2 all -- all are abandoned.
>
> . . .
>
> [ALOHA SPORTS]: Excuse me. We don't think on the record we can satisfy the test that the Hawaii Supreme Court established with the Davis case, which converted 480-2 which was a redundant antitrust statute, but I don't think we can do that, so that's-
>
> THE COURT: Right. It makes it very, very difficult to satisfy proof especially without an expert.
>
> . . .
>
> [NCAA]: So it's clear that the theory of contract based on the handbook is also out?
>
> [ALOHA SPORTS]: Correct. The singular claims prospective advantage.
>
> THE COURT: Right. That's --
>
> [NCAA]: So we're down to one cause of action interference with respective [sic] economic advantage.
>
> THE COURT: That's correct.
>
> [NCAA]: And everything else is dismissed.
>
> THE COURT: That's correct.

10

was dismissed with prejudice pursuant to the February 26, 2008 order.  It further stated that claims in the second amended complaint that had been dismissed by the "2/28/08 Dismissal Order"[11] but repeated in the third amended complaint were equally dismissed, and that Aloha Sports' "remaining" HRS § 480-2 claims in the third amended complaint were dismissed with prejudice pursuant to Aloha Sports' September 8, 2011 oral motion.

After unsuccessfully moving the court to vacate the final judgment and grant a new trial, Aloha Sports filed a notice of appeal from the final judgment and other orders in the case, including specifically from the Order Dismissing UMOC Claim.[12]

On October 30, 2013, the ICA issued a memorandum opinion.[13]  As to the dismissal of the UMOC claim, the ICA found that a factual basis for the claim could be discerned from the facts alleged in the second amended complaint.  Specifically, the ICA pointed to the complaint's allegations that the "NCAA

_____

[11]    It appears that section 3 of the Final Judgment mistakenly refers to the "2/26/08 Dismissal Order" as the "2/28/08 Dismissal Order."

[12]    Aloha Sports also appealed from the Order Granting in Part and Denying in Part Defendant The National Collegiate Athletic Association's Motion for Attorneys' Fees and Costs, Filed January 31, 2012 (Attorney's Fee Order).

[13]    The ICA's memorandum opinion can be found at Aloha Sports Inc. v. NCAA, No. CAAP-12-0000512, 2013 WL 5823893 (Haw. App. Oct. 30, 2013).

11

knew about the pending sale to Pro Sports and the significance of certification to the pending transaction," and that "the NCAA disrupted the transaction by encouraging Pro Sports to abandon the deal with Aloha and apply for a bowl game independent of Aloha." The ICA held that, if true, these alleged facts would be sufficient to establish that the NCAA employed an unfair method of competition. Accordingly, the ICA vacated the Order Dismissing UMOC Claim and the circuit court's January 12, 2012 final judgment and remanded the case to the circuit court for further proceedings.[14]

### C. Circuit Court Proceedings on Remand

On remand, the NCAA filed a motion for judgment on the pleadings, or in the alternative, a motion for summary judgment on the UMOC claim (Motion for Summary Judgment).[15] The NCAA argued that the UMOC claim was barred by collateral estoppel because Aloha Sports relied on the same allegations underlying the UMOC claim to support its claim for tortious interference with prospective business advantage at the jury trial and the jury had decided these factual issues in the NCAA's favor. The

---

[14] The ICA also vacated the Attorney's Fee Order and affirmed all other circuit court rulings at issue.

[15] The Honorable Karl K. Sakamoto also presided over the circuit court proceedings on remand.

NCAA contended that, because the facts were actually litigated, finally decided, and essential to the final judgment, Aloha Sports should be estopped from relitigating them on remand.

The NCAA also maintained that Aloha Sports was judicially estopped from pursuing the UMOC claim because at the motion in limine hearing on September 8, 2011, Aloha Sports abandoned all claims other than the claim for tortious interference with prospective business advantage and conceded it could not meet the burden of establishing a violation of HRS § 480-2. The NCAA asserted that (1) Aloha Sports' present position was factually incompatible with its prior position; (2) the prior inconsistent position had been accepted by the court; and (3) permitting Aloha Sports to continue to pursue the UMOC claim granted Aloha Sports an unfair advantage.

As to the merits of the UMOC claim, the NCAA argued that there was no dispute that the NCAA had legitimate business reasons not to certify the 2003 Seattle Bowl, including the 2002 Seattle Bowl's untimely letter of credit and lack of payment to teams and local vendors. The NCAA maintained that discovery had closed and Aloha Sports could not present any evidence that decertification was intended to induce Pro Sports to forgo the contemplated purchase of Aloha Sports. Thus, the NCAA argued, Aloha Sports could not prove that it was harmed as a result of

13

actions by the NCAA that negatively affected competition.  The NCAA also contended that it was entitled to summary judgment because Aloha Sports had not presented any facts demonstrating an anti-competitive impact on the bowl game market as a result of the NCAA's alleged actions.

In its memorandum in opposition, Aloha Sports responded that the UMOC claim was not barred by collateral estoppel because the jury made no specific findings of fact when it decided in the NCAA's favor on the claim for interference with prospective economic advantage.  Additionally, Aloha Sports asserted, the elements of an unfair method of competition claim are distinct from those of a claim for interference with prospective economic advantage.  Further, Aloha Sports argued, no final judgment existed for purposes of collateral estoppel because it had been vacated by the ICA decision.  The UMOC claim was also not barred by judicial estoppel, Aloha Sports contended, because the claim had already been dismissed in February 26, 2008.  Therefore, Aloha Sports maintained, the claim could not have been abandoned or conceded at the September 8, 2011 hearing.

Aloha Sports also argued that it presented sufficient evidence demonstrating that the NCAA denied recertification of the 2003 Seattle Bowl in order to induce Pro Sports to abandon

14

its intent to purchase Aloha Sports. Aloha Sports contended that, contrary to the NCAA's assertion, it did not need to prove that its injury resulted from actions by the NCAA that were harmful to competition to withstand summary judgment.

On June 9, 2015, the circuit court issued an order granting summary judgment to the NCAA on the UMOC claim (Order Granting Summary Judgment).[16] The court held that Aloha Sports was barred by waiver and judicial estoppel because Aloha Sports had implicitly surrendered the UMOC claim by its statements at the September 8, 2011 hearing. The circuit court reasoned that the UMOC claim required proof of an additional element under this court's precedents and thus would have been more difficult to prevail upon than the alleged HRS § 480-2 violations that Aloha Sports expressly abandoned. Aloha Sports therefore impliedly conceded that it was unable to prove the UMOC claim when it voluntarily dismissed its other HRS § 480-2 claims, the court concluded.

The circuit court also held that Aloha Sports was collaterally estopped from proceeding on its UMOC claim. The

_____

[16] The full title of the court's order is "Order Granting Defendant The National Collegiate Athletic Association's Motion For Judgment On The Pleadings, Or In The Alternative, For Summary Judgment On The Sole Remaining Claim For Unfair Competition Alleged In Plaintiff's Third Amended Complaint, Filed May 27, 2011, Filed September 25, 2014 [Civ. No. 06-1-1832-10 (June 9, 2015)]."

15

court stated that, because Aloha Sports had not alleged one of the specific violations of HRS § 480-2(a) identified by statute, it fell to the court to identify the elements that must be satisfied to establish an unfair method of competition in this case. The court determined that the alleged unfair method of competition--the NCAA's interference with Aloha Sports' transfer to Pro Sports--was essentially a claim for tortious interference with prospective business advantage, and HRS § 480-2(a) therefore incorporated the elements of a tortious interference claim. Accordingly, the circuit court found that proving facts establishing tortious interference was a prerequisite to proving that the NCAA derivatively violated HRS § 480-2. Because the jury had entered a verdict in favor of the NCAA on the tortious interference claim and a final judgment had been issued, the court concluded that Aloha Sports could not now proceed on an unfair method of competition claim based on the same alleged conduct.

The court further held that the NCAA had successfully demonstrated that it acted with a legitimate business purpose in denying the recertification of the 2003 Seattle Bowl, that Aloha Sports did not submit any evidence showing that the NCAA acted in an anticompetitive manner, and that Aloha Sports did not demonstrate that its injury resulted from the NCAA's alleged

16

anticompetitive conduct.  Final judgment was entered in favor of the NCAA on August 11, 2015,[17] from which Aloha Sports appealed to the ICA.

### D.    Second ICA Appeal

On October 30, 2017, the ICA issued a Summary Disposition Order affirming the circuit court's grant of summary judgment in favor of the NCAA.[18]  The ICA held that Aloha Sports failed to present any evidence that the NCAA's alleged conduct affected competition, which was needed to satisfy the nature of competition requirement of a claim for an unfair method of competition in violation of HRS § 480-2(a).  Specifically, the ICA held that Aloha Sports failed to (1) specify the relevant market; (2) provide evidence of the anticompetitive effect of the NCAA's conduct on that market; and (3) demonstrate how Aloha Sports, a bowl-sponsoring agency, was in competition with the NCAA.  Further, the ICA stated that, in order to prove an anticompetitive effect, it was not sufficient for Aloha Sports to prove harm to its individual business.  Rather, Aloha Sports

---

[17]    The final judgment also included an order granting in part and denying in part a motion for reinstatement of the Attorney's Fee Order, filed August 4, 2015 (Order to Reinstate Attorney's Fee Order).

[18]    The ICA's SDO can be found at Aloha Sports Inc. v. The NCAA, NO. CAAP-15-0000663, 2017 WL 4890131 (Haw. App. Oct. 30, 2017), as corrected (Jan. 11, 2018).

was required to demonstrate an adverse impact to competitive conditions generally within the commercial field in which it was engaged.

Additionally, the ICA held that the NCAA's conduct was not an unfair competitive act because the 2001-02 Handbook allowed for decertification of a non-compliant bowl, and the NCAA demonstrated that Aloha Sports had not complied with certification requirements pertaining to the 2002 Seattle Bowl.[19]

Based on its holdings regarding the UMOC claim, the ICA did not reach the other reasons cited by the circuit court for granting summary judgment--waiver, judicial estoppel, and collateral estoppel. The ICA thus affirmed the circuit court's ruling granting NCAA summary judgment on the UMOC claim.[20]

Aloha Sports timely filed an application for writ of certiorari from the ICA's January 24, 2018 Judgment on Appeal, which this court granted.

---

[19] The ICA specifically cited the 2001-02 Handbook in its SDO, which did not contain the conflicting provision added in the 2002-03 Handbook that stated nonfulfillment of certification requirements would be punished by probation. See supra text accompanying note 5.

[20] The ICA also affirmed the "Judgment" entered on August 11, 2015; the Order to Reinstate Attorney's Fees Order; and the Attorney's Fee Order.

## II.      STANDARD OF REVIEW

This court reviews a trial court's grant or denial of summary judgment de novo.  Anastasi v. Fid. Nat'l Title Ins. Co., 137 Hawai'i 104, 112, 366 P.3d 160, 168 (2016) (citing Bremer v. Weeks, 104 Hawai'i 43, 51, 85 P.3d 150, 158 (2004)).

## III.      DISCUSSION

On certiorari, Aloha Sports contends that the ICA erred in the evidence it required Aloha Sports to present to withstand summary judgment on its UMOC claim.  In light of our resolution of this issue, we also address the circuit court's alternative grounds for granting summary judgment, including that Aloha Sports' claim was waived and that Aloha Sports was judicially and collaterally estopped from proceeding upon this claim.[21]  We evaluate each issue in light of the legal standard for summary judgment:[22]

> [S]ummary judgment is appropriate if . . . there is no genuine issue as to any material fact and that the moving

---

[21]    Aloha Sports also challenges on certiorari the ICA's affirmation of the circuit court's Order to Reinstate Attorney's Fees Order and the Attorney's Fee Order.

[22]    In this case, the record indicates that the NCAA's motion was filed after the close of discovery.  It is noted that the movant's burden is generally greater when a party seeks summary judgment before discovery has concluded.  See Ralston v. Yim, 129 Hawai'i 46, 48, 61, 292 P.3d 1276, 1278, 1291 (2013) ("[I]n general, a summary judgment movant cannot merely point to the non-moving party's lack of evidence to support its initial burden of production if discovery has not concluded." (citing French v. Hawaii Pizza Hut, Inc., 105 Hawai'i 462, 472, 99 P.3d 1046, 1056 (2004))).

> party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party.

Anastasi v. Fid. Nat'l Title Ins. Co., 137 Hawai'i 104, 112, 366 P.3d 160, 168 (2016) (quoting Omerod v. Heirs of Kaheananui, 116 Hawai'i 239, 254–55, 172 P.3d 983, 998–99 (2007)).

## A.     Evidence Necessary to Withstand Summary Judgment on an HRS § 480-2 Unfair Method of Competition Claim

Hawaii's antitrust law, codified in HRS Chapter 480, includes a general prohibition at HRS § 480-2(a) stating that unfair methods of competition in the conduct of any trade or commerce are unlawful.[23] HRS § 480-13 (1993 & Supp. 2002)[24] in

---

[23]     HRS § 480-2 (2008) in relevant part provides as follows:

(a)   Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

. . .

(e)   Any person may bring an action based on unfair methods of competition declared unlawful by this section.

[24]     HRS § 480-13 provides in relevant part as follows:

(a) Except as provided in subsections (b) and (c), any person who is injured in the person's business or property by reason of anything forbidden or declared unlawful by this chapter:

(1) May sue for damages sustained by the person and, if the judgment is for the plaintiff, the plaintiff shall be awarded a sum not less than $1,000 or threefold damages by the plaintiff sustained, whichever sum is the greater . . . .

(Emphasis added.)

turn establishes a private right of action to seek recovery for damages flowing from a party's HRS Chapter 480 violation.

To recover under HRS § 480-13(a) for an unfair method of competition violation, a plaintiff must prove: (1) a violation of HRS Chapter 480; (2) an injury to the plaintiff's business or property that flows from the defendant's conduct that negatively affects competition or harms fair competition; and (3) proof of damages. Gurrobat v. HTH Corp., 133 Hawaiʻi 1, 21, 323 P.3d 792, 812 (2014). The second element has two parts. Id. First, a plaintiff is required to demonstrate "an injury in fact to his or her 'business or property.'" Id. Second, a plaintiff is required to show the "nature of the competition." Id. This latter requirement is met by demonstrating how the defendant's conduct negatively affects competition or harms fair competition. Id. at 22-23, 323 P.3d at 813-14.

We thus consider if Aloha Sports demonstrated a question of material fact as to the elements of its UMOC claim and whether the ICA imposed evidentiary requirements beyond what was required under our law.[25]

_____

[25]    In evaluating a motion for summary judgment, we apply a burden-shifting framework under which the moving party bears the initial burden of demonstrating that no genuine issue of material fact exists with respect to the essential elements of the claim and that the undisputed facts entitle the party to judgment as a matter of law. See Gurrobat v. HTH Corp., 133 Hawaiʻi 1, 14, 323 P.3d 792, 805 (2014). Where, as here, the non-movant bears the

(continued . . .)

21

### 1.  First Element: Violation of HRS Chapter 480

The first element for recovery under HRS § 480-13(a) is proof of an HRS Chapter 480 violation.  HRS § 480-2(a) does not define unfair methods of competition, although a number of other statutes cross-reference the provision and specify that particular practices are per se violations of the prohibition. See, e.g., HRS § 480D-4(a) (2008); HRS § 481B-4 (2008).  This court has recognized that the statutorily enumerated violations are not an exhaustive catalogue of conduct that violates HRS § 480-2, as "[t]here is no limit to human inventiveness in this field."  Cieri v. Leticia Query Realty, Inc., 80 Hawai'i 54, 61, 905 P.2d 29, 36 (1995) (quoting H. Stand. Comm. Rep. No. 55, in 1965 House Journal, at 538).

---

(. . . continued)

burden of proof at trial, the movant may meet its initial burden by either "(1) presenting evidence negating an element of the non-movant's claim, or (2) demonstrating that the non-movant will be unable to carry his or her burden of proof at trial."  Ralston, 129 Hawai'i at 60-61, 292 P.3d at 1290-91 (citing French, 105 Hawai'i at 470-72, 99 P.3d at 1054-56)).  "Only once the moving party has satisfied its initial burden of production does the burden shift to the non-moving party to show specific facts that present a genuine issue for trial."  Gurrobat, 133 Hawai'i at 14, 323 P.3d at 805.

In this case, the circuit court found that the NCAA had met its initial burden and that Aloha Sports then failed to present sufficient evidence to raise a genuine issue of material fact.  Because Aloha Sports' arguments before this court focus on the sufficiency of the evidence it presented, the circuit court's finding that the NCAA met its initial burden appears to be uncontested.

The circuit court in this case stated that, because the unfair method of competition alleged here is not specifically defined by statute, it fell to the court to determine the appropriate elements of a HRS § 480-2(a) violation in this context.  The court reasoned that the alleged offending conduct was essentially a claim for tortious interference with prospective business advantage, and thus it was necessary to prove the elements of the tort in order to prove a HRS § 480-2(a) violation.

Under our precedents, however, the evaluation of whether particular, non-statutorily-enumerated conduct is unfair is simply a question of fact that does not require incorporating the elements of an analogous claim.  See Robert's Hawaii School Bus, Inc. v. Laupahoehoe Transp. Co., 91 Hawaiʻi 224, 239, 982 P.2d 853, 868 (1999), superseded by statute on other grounds. "[C]ompetitive conduct 'is unfair when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'"[26]  Id. at 255 n.34, 982 P.2d at 884 n.34 (quoting

_____

[26]    Although the standard to prove a HRS § 480-2 violation and the elements to establish a tortious interference with economic advantage may seem similar in that the latter requires that a plaintiff intended to either pursue "an improper objective of harming the plaintiff or use[] wrongful means," Hawaii Med. Ass'n v. Hawaii Med. Serv. Ass'n, Inc., 113 Hawaiʻi 77, 116, 148 P.3d 1179, 1218 (2006) (quoting Omega Envtl., Inc. v. Gilbarco,

(continued . . .)

State ex rel. Bronster v. U.S. Steel Corp., 82 Hawaiʻi 32, 51, 919 P.2d 294, 313 (1996)). The circuit court thus erred in finding that it was necessary for Aloha Sports to prove a claim for tortious interference with prospective business advantage in order to demonstrate a HRS § 480-2(a) violation.

In its memorandum opinion addressing Aloha Sports' first appeal, the ICA ruled that Aloha Sports sufficiently alleged facts to discern a claim for which relief could be granted by alleging that the NCAA knew about Aloha Sports' pending sale to Pro Sports and that the NCAA disrupted the transaction by encouraging Pro Sports to abandon the deal with Aloha Sports and apply for a bowl game independently of Aloha Sports.

On remand, Aloha Sports substantiated its allegations of the NCAA's knowledge of the pending sale by providing evidence that the Subcommittee received information on Pro Sports' qualifications to organize and promote the 2003 Seattle Bowl and to pay the 2002 Seattle Bowl debts. Additionally, Aloha Sports submitted to the court the NCAA's internal "Seattle Bowl Issues" memorandum that stated that the sale of Aloha

(. . . continued)

Inc., 127 F.3d 1157, 1166 (9th Cir. 1997)), the elements of the two claims are not identical. See infra, § III.C.

24

Sports to Pro Sports was contingent upon recertification of the Seattle Bowl. Aloha Sports also submitted evidence that the NCAA expressed concern that Aloha Sports' Terry Daw would remain involved after the sale of Aloha Sports to Pro Sports, and that immediately after announcing the decertification of the Seattle Bowl, the NCAA's Dennis Poppe and the Subcommittee privately informed Feller, CEO of Pro Sports, that it could reapply independently for certification of the Seattle Bowl the following year. Aloha Sports also provided evidence raising a question of fact as to whether the NCAA arbitrarily failed to apply its requirement for a one-year probation period prior to decertification of a bowl that was established for the 2002-03 season.

This evidence, at a minimum, gives rise to a question of material fact as to whether the NCAA unfairly decertified the 2003 Seattle Bowl in order to disrupt the transaction between Aloha Sports and Pro Sports, which a jury could consider immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. Thus, Aloha Sports demonstrated a factual dispute as to a violation of HRS § 480-2(a) by virtue of an unfair method of competition. The circuit court therefore erred in concluding that summary judgment was warranted on this basis.

## 2. Second Element: Injury & Nature of Competition

### a. Actual Harm to Competition Not Required to Withstand Summary Judgment

To fulfill the second element of an unfair method of competition violation, a plaintiff must (a) demonstrate an injury in fact to one's business and (b) demonstrate how a defendant's conduct negatively affects competition or harms fair competition.  Gurrobat, 133 Hawaiʻi at 21, 323 P.3d at 812.

As to the injury requirement, the injury in fact must flow from the anticompetitive conduct.  Id. at 23, 323 P.3d at 814.  Aloha Sports meets the injury requirement because it presented evidence that as a result of the NCAA's allegedly unfair decertification of the 2003 Seattle Bowl--the NCAA's allegedly anticompetitive conduct--Aloha Sports was unable to complete its sale to Pro Sports.

Turning to the nature of the competition requirement, Aloha Sports contends that the ICA erred by holding that Aloha Sports was required to provide evidence of anticompetitive effects within that market to withstand summary judgment.  In response, the NCAA maintains that the ICA correctly applied Hawaiʻi and federal precedent to find that Aloha Sports did not meet its burden as to the nature of competition requirement.

We recently addressed a plaintiff's burden when opposing summary judgment on an unfair method of competition claim in Gurrobat v. HTH Corporation, 133 Hawai'i 1, 323 P.3d 792 (2014). In that case, service employees brought suit against the operators of hotels (hotels) for distributing to non-service employees a portion of the service charges it collected from customers without informing customers of the practice, in contravention of HRS § 481B-14. Id. at 16-17, 323 P.3d at 807-08. We found that a genuine issue of material fact existed as to the nature of competition requirement based upon evidence that the hotels' non-compliance with the service-charge law allowed the hotels to lower their overall prices and thereby obtain an "unfair and illegal business advantage" over compliant competitors. Id. at 22, 323 P.3d at 813. Showing that the conduct of the hotels enabled them to create incentives for customers to choose their services over compliant competitors' services was sufficient to demonstrate that their conduct could have negatively affected competition and thus defend against summary judgment. Id.; see Hawaii Med. Ass'n v. Hawaii Med. Serv. Ass'n, Inc., 113 Hawai'i 77, 113, 148 P.3d 1179, 1215 (2006). It was not necessary for the plaintiffs to prove at a summary judgment proceeding that the hotels' conduct had in fact harmed competition. See Gurrobat, 133 Hawai'i at 22, 323 P.3d at

27

813. Further, although the plaintiffs in Gurrobat offered the evidence through expert testimony, we noted that expert testimony was not necessary to create a genuine issue of material fact regarding harm to competition sufficient to withstand summary judgment.  See id.

In this case, Aloha Sports set forth how the NCAA's alleged anti-competitive conduct would negatively affect competition.  Aloha Sports contends that the NCAA's decertification of the 2003 Seattle Bowl incentivized Pro Sports to abandon its agreement with Aloha Sports and to independently seek certification of a future Seattle Bowl through the NCAA. Cf. Gurrobat, 133 Hawaiʻi at 22, 323 P.3d at 813 ("plaintiffs may prove how a defendant's conduct negatively affects competition by showing that defendant's conduct enables the defendant to create incentives for customers to purchase banquet services from the defendant instead of competitors . . . ."); Hawaii Med. Ass'n, 113 Hawaiʻi at 113, 148 P.3d at 1215 (holding that plaintiffs may demonstrate harm to competition by showing the defendant engaged in "acts or practices that . . . create incentives for patients to look elsewhere").  Aloha Sports provided evidence that the NCAA no longer wished to deal with Aloha Sports' management and that immediately after its decertification of the 2003 Seattle Bowl, the NCAA privately

28

informed Pro Sports that it could apply independently for certification of the Seattle Bowl in 2004. If true, the NCAA's conduct could be construed as wielding its power to ensure that it only deals with its staff's preferred applicants rather than evaluating certification decisions in compliance with its established rules and procedures.

It is reasonable to infer from this evidence that, as argued by Aloha Sports, the NCAA's allegedly arbitrary certification decision could negatively affect competition by (1) restricting the transfer of ownership of bowl games contingent upon recertification; (2) leading to lower prices for the sale of bowl sponsoring agencies because of uncertainty as to whether a bowl will gain recertification; and (3) acting as a restriction on output that would result in a loss of financial benefits to schools and consumers who would have otherwise participated in a given bowl. [W]e must view all of the evidence and the inferences drawn therefrom[] in the light most favorable to the party opposing the motion." Anastasi, 137 Hawai'i at 112, 366 P.3d at 168 (emphasis added) (quoting Omerod, 116 Hawai'i at 254–55, 172 P.3d at 998–99).

Taken together in the light most favorable to Aloha Sports, Aloha Sports has presented evidence raising a genuine issue of material fact as to whether the NCAA's conduct could

negatively affect competition. Thus, the ICA erred in holding that "Aloha [Sports] has failed to provide any evidence that the NCAA's conduct negatively affected competition," and that Aloha Sports did not raise an issue of material fact as to the "nature of competition" to substantiate its UMOC claim.

Based on the foregoing, we conclude that Aloha Sports raised a genuine issue of material fact as to the second element of a HRS § 480-13(a) claim: an injury to the plaintiff's business or property that flows from the defendant's conduct that negatively affects competition or harms fair competition.[27]

### b. Proof of Relevant Market, Harm to Market as a Whole, and Competition with Defendant Not Required to Withstand Summary Judgment

In its analysis regarding the nature of competition requirement, the ICA held that to withstand summary judgment, Aloha Sports needed to specify the relevant market and demonstrate that the alleged conduct affected that market beyond an adverse effect on Aloha Sports' business. The ICA also concluded that Aloha Sports was required to but failed to

---

[27] The third element is proof of damages. Gurrobat, 133 Hawai'i at 23, 323 P.3d at 814. Neither the circuit court in granting summary judgment nor the ICA in affirming the circuit court based its decision on the absence of a showing of proof of damages. Accordingly, since this issue is undisputed and was not relied upon by the circuit court, we conclude that Aloha Sports raised a disputed fact as to this element also.

demonstrate that it was a competitor of or in competition with the NCAA.

First, to defend against summary judgment, it is sufficient for a plaintiff to offer proof of the general market at issue without resort to expert testimony. In Gurrobat, the plaintiffs contended that the defendants' asserted unfair method of competition would reduce fair competition "in the market for hotels, restaurants, and banquet service providers"--those generally in the field of competition with the defendant. 133 Hawaiʻi at 22, 323 P.3d at 813. We did not require the plaintiffs to define the market with great specificity in order to raise a genuine issue of material fact. Here, Aloha Sports presented sufficient evidence to discern the affected market by describing the NCAA's certification process and the underlying competition among bowl sponsoring agencies vying for NCAA certification of bowl games, the member institutions that participate in the bowls, and the consumers that attend the bowls.

Second, the ICA overstated the nature of competition requirement on summary judgment as necessitating proof that the defendant's conduct in fact negatively affected the market beyond Aloha Sports' own injury. As stated in Gurrobat, demonstrating actual negative effects on or harm to fair

31

competition in the relevant market is not required.[28]  133 Hawaiʻi

at 22, 323 P.3d at 813.

Finally, the ICA noted that Aloha Sports failed to

demonstrate that it was in competition with the NCAA.  It is

well settled, however, that plaintiffs need not be competitors

or in competition with defendants to establish or recover from

an unfair method of competition in violation of HRS § 480-2(a).

Davis v. Four Seasons Hotel Ltd., 122 Hawaiʻi 423, 435, 228 P.3d

303, 315 (2010); Hawaii Med. Ass'n, 113 Hawaiʻi at 110, 148 P.3d

at 1212; see also HRS § 480-2(e) ("Any person may bring an

action based on unfair methods of competition declared unlawful

by this section." (emphasis added)).

Thus, the ICA erred in affirming summary judgment on

the bases that (1) Aloha Sports "failed to specify the relevant

market," (2) Aloha Sports did not demonstrate harm to the

market, and (3) Aloha Sports did not demonstrate that it was a

competitor of or in competition with the NCAA.

---

[28]  Additionally, the U.S. Supreme Court has held that under federal anti-trust law, harm to a single business may suffice to establish an anti-trust violation.  Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 213 (1959) ("As such [a boycott by a combination of manufactures and dealers] is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy.").

### B. Waiver and Judicial Estoppel

On remand, the circuit court held that Aloha Sports was barred by waiver and judicial estoppel from asserting its UMOC claim based on Aloha Sports' statement at a pre-trial hearing that it was solely preceding on its claim for interference with prospective business advantage and was abandoning all other claims.[29]

A waiver does not occur when there is no right in existence to be waived. See Coon v. City & Cty. of Honolulu, 98 Hawai'i 233, 261, 47 P.3d 348, 376 (2002) ("To constitute a waiver, there must have existed a right claimed to have been waived and the waiving party must have had knowledge, actual or constructive, of the existence of such a right at the time of the purported waiver." (citations omitted)). Here, the circuit court had dismissed Aloha Sports' UMOC claim with prejudice three years prior to the 2011 pre-trial hearing when the purported waiver occurred. Indeed, the circuit court's final judgment, filed January 12, 2012, distinguished between the

---

[29]     As noted, the ICA did not address the circuit court's holdings on waiver, judicial estoppel, or collateral estoppel. However, the NCAA requested at oral argument that this court address these holdings if we were to conclude that there were disputed facts regarding the elements of a UMOC claim and that summary judgment had thus been improperly granted on this ground. Oral Argument at 00:36:50, Field v. The NCAA (No. SCWC-15-663), http://oaoa.hawaii.gov/jud/oa/18/SCOA_071918_SCWC_15_663.mp3.

claims dismissed in the Order Dismissing UMOC Claim and the "remaining claims," which were dismissed by Aloha Sports' voluntary waiver at the pre-trial hearing. Thus, unlike the claims that were voluntarily dismissed, Aloha Sports did not have a then-existing right to proceed on the UMOC claim when the 2011 pre-trial hearing occurred.

In other words, prior to prevailing on its appeal of the Order Dismissing UMOC Claim, Aloha Sports could not have proceeded on the dismissed claim before the circuit court and therefore could not waive that nonexistent right at the hearing. Therefore, the circuit court erred in finding that Aloha Sports had waived its UMOC claim.[30]

The doctrine of judicial estoppel precludes a party from assuming a position that is inconsistent with a position already accepted by the court to gain an unfair advantage in the proceedings. See Gurrobat v. HTH Corp., 133 Hawai'i 1, 20, 323 P.3d 792, 811 (2014); Roxas v. Marcos, 89 Hawai'i 91, 124-25, 969 P.2d 1209, 1242-43 (1998). The doctrine is intended to protect

---

[30] The circuit court held that Aloha Sports impliedly waived the UMOC claim at the pre-trial hearing because it was more difficult to prove than the other HRS § 480-2 claims that it expressly waived. Our precedent does not make a distinction between an implied and express waiver in this regard; without a then-existing right to proceed on the UMOC claim, Aloha Sports was not capable of waiving the claim by implication. See Coon, 98 Hawai'i at 261, 47 P.3d at 376.

the integrity of the judicial system and prevents parties from "playing 'fast and loose' with the court or blowing 'hot and cold' during the course of litigation," thereby promoting "orderliness, regularity, and expedition of litigation." Gurrobat, 133 Hawai'i at 20, 323 P.3d at 811 (quoting Rosa v. CWJ Contractors, Ltd., 4 Haw. App. 210, 218-19, 664 P.2d 745, 751 (1983)). Because we hold that Aloha Sports did not waive its UMOC claim at the pre-trial hearing, Aloha Sports did not assume an inconsistent position by asserting its right to proceed on that claim. Thus, Aloha Sports was not judicially estopped from raising the UMOC claim.

Accordingly, we hold that the circuit court erred in finding that waiver and judicial estoppel applied to preclude Aloha Sport's assertion of its UMOC claim.

### C. Collateral Estoppel

The circuit court also held on remand that based on the jury trial verdict finding that Aloha Sports failed to prove by a preponderance of the evidence that the NCAA tortiously interfered with Aloha Sport's sale of itself to Pro Sports, Aloha Sports was collaterally estopped from pursuing its UMOC claim. Collateral estoppel, or issue preclusion, is a bar to the relitigation of a fact or issue litigated in a prior suit when four requirements are met:

> (1) the issue decided in the prior adjudication is identical to the one presented in the action in question; (2) there is a final judgment on the merits; (3) the issue decided in the prior adjudication was essential to the final judgment; and (4) the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication.

Dorrance v. Lee, 90 Hawaiʻi 143, 149, 976 P.2d 904, 910 (1999).

As an initial matter, Aloha Sports is correct in its contention that, because the ICA vacated the circuit court's January 12, 2012 final judgment, no final judgment in a prior case currently exists and the elements of collateral estoppel are not met. Nevertheless, we must consider whether the jury's determination as to Aloha Sports' claim for tortious interference with prospective business advantage resolved facts in this case that would necessarily preclude recovery on Aloha Sports' UMOC claim.

The elements of a HRS § 480-13(a) claim based on an unfair method of competition and a claim for intentional or tortious interference with prospective business advantage are not identical.  To establish an unfair method of competition claim, a plaintiff must prove: "(1) a violation of HRS Chapter 480; (2) which causes an injury to the plaintiff's business or property; and (3) proof of the amount of damages."  Gurrobat v. HTH Corp., 133 Hawaiʻi 1, 21, 323 P.3d 792, 812 (2014).  Under the second element, a plaintiff must demonstrate that the defendant's conduct negatively affects competition and that the

36

plaintiff's injury stems from the defendant's anti-competitive or unfair conduct.  Id. at 22-23, 323 P.3d at 813-14.  There is no intent element required to establish an unfair method of competition claim.  See Hungate v. Law Office of David B. Rosen, 139 Hawaiʻi 394, 413, 391 P.3d 1, 20 (2017) (citing Short v. Demopolis, 103 Wash.2d 52, 691 P.2d 163, 172 (Wash. 1984) (Pearson, J., concurring)).

In contrast, the elements of intentional or tortious interference with prospective business advantage require the plaintiff to prove all of the following:

> (1) the existence of a valid business relationship or a prospective advantage or expectancy sufficiently definite, specific, and capable of acceptance in the sense that there is a reasonable probability of it maturing into a future economic benefit to the plaintiff; (2) knowledge of the relationship, advantage, or expectancy by the defendant; (3) a purposeful intent to interfere with the relationship, advantage, or expectancy; (4) legal causation between the act of interference and the impairment of the relationship, advantage, or expectancy; and (5) actual damages.

Robert's Hawaii Sch. Bus, Inc. v. Laupahoehoe Transp. Co., Inc., 91 Hawaiʻi 224, 258, 982 P.2d 853, 887 (1999) (citations and footnote omitted) (emphasis added).  Notably, unlike an unfair method of competition claim, tortious interference with prospective business advantage includes a purposeful intent element.

Although Aloha Sports relies on many of the same underlying facts to support the UMOC claim as the tortious

interference with prospective business advantage claim, the jury's verdict on the interference with prospective business advantage claim did not provide any specific determinations regarding the individual elements of that claim.[31] Thus, it is unclear which issues and facts the jury determined to render its verdict. For example, the jury could have determined that the NCAA was not liable for tortious interference with prospective business advantage based solely on a failure to meet the purposeful intent element--an element not required in an UMOC claim. Simply stated, the jury's determination that the NCAA was not liable for tortious interference with prospective business advantage did not definitively resolve factual issues that would prevent Aloha Sports from satisfying the elements of its UMOC claim. Accordingly, the circuit court erred in holding that issue preclusion barred Aloha Sports from asserting its UMOC claim.

---

[31] The Special Verdict Form stated, "Did Plaintiff ASI prove by a preponderance of the evidence that Defendant NCAA tortiously interfered with ASI's prospective business advantage with Pro Sports & Entertainment?" In the space marked "No" the jury indicated that all "12" jurors found that Aloha Sports had not proven tortious interference beyond a preponderance of the evidence. Because the jury marked "No" on the first question, the jury was not required to and did not respond to the remaining questions, i.e., whether Aloha Sports had proven beyond a preponderance of the evidence that the NCAA's actions were the cause of Aloha Sports harm, or the reasonable dollar amount of that harm.

## IV.    CONCLUSION

Based on the foregoing, Aloha Sports raised genuine issues of material fact as to the first and second elements of an UMOC claim.  The third element, damages, has not been contested.  Therefore, the ICA erred in affirming the circuit court's order and judgment granting the NCAA summary judgment.  Further, the circuit court erred in holding that Aloha Sports was estopped from asserting the UMOC claim based on waiver, judicial estoppel, and collateral estoppel.  We therefore vacate the ICA's judgment on appeal, the circuit court's final judgment, and the Order Granting Summary Judgment, and the case is remanded to the circuit court for proceedings consistent with this opinion.[32]

| | |
|---|---|
| Amy T. Brantly | /s/ Mark E. Recktenwald |
| Frederick W. Rohlfing, III | |
| for petitioner | /s/ Paula A. Nakayama |
| | |
| Gregory L. Curtner | /s/ Sabrina S. McKenna |
| William C. McCorriston | |
| Jordon J. Kimura | /s/ Richard W. Pollack |
| for respondent | |
| | /s/ Michael D. Wilson |



---

[32]    Based on our disposition, the ICA's holding affirming the Attorney's Fee Order is also vacated because it flows from the ICA and circuit court's holdings that the NCAA was the prevailing party on summary judgment.  See HRS § 607-14 (2016); Blair v. Ing, 96 Hawai'i 327, 331, 31 P.3d 184, 188 (2001).